FREDERICK FORTNER,      )    C.A. No. 2:09-3060-RMG-RSC
                         )

        Plaintiff,    )

                         )

     -versus-     )    **REPORT AND RECOMMENDATION**

                         )

ROPER SAINT FRANCIS HOSPITAL, )

                         )

        Defendant.   )

This employment discrimination case brought by Frederick Fortner (Fortner) a former employee of the defendant Roper Saint Francis Hospital (RSFH) alleging violations of Title VII, 42 U.S.C. § 2000e et seq., (Title VII) and 42 U.S.C. § 1981, and state claims of breach of a contractual relationship and interference with a contractual relationship is before the undersigned United States Magistrate Judge for a report and recommendation on the defendant's motion for summary judgment. 28 U.S.C. § 636(b).

This action was removed from the Charleston County Court of Common Pleas on November 23, 2009, because it alleged federal claims of race discrimination as well as state actions subject to the supplemental jurisdiction of this court. Discovery was completed on July 1, 2010, and the instant motion was filed on July 15, 2010. Opposition was filed on August 15, 2010; a reply was filed on August 15, 2010, and oral arguments were heard on August 30, 2010. The matter is now ripe for review.

## PLAINTIFF'S CLAIMS

In his complaint, the plaintiff, Fredrick Fortner (Fortner), an African American male, alleges that the termination of his employment with Roper St. Francis Healthcare (RSFH) supports the following causes of action:

> 1. Race discrimination by RSFH in his termination in violation of Title VII of the Civil Rights Act of 1964, and 42 U.S.C. Section 1981;
>
> 2. Breach of a contractual relationship by RSFH in failing to follow the RSFH grievance procedure[1];
>
> 3. Interference by RSFH with Fortner's contractual relationship with Freeland Construction, one of his subsequent employers.

## DEFENDANT'S MOTION

RSFH asserts that it is entitled to summary judgment because:

> 1. Fortner has not presented any direct evidence of discrimination and Fortner cannot show that he was meeting RSFH's expectations when he was terminated or that others were retained under circumstances similar to those which resulted in his termination.
>
> 2. Fortner has not provided any evidence that RSFH's legitimate, nondiscriminatory reasons for terminating his employment are pretextual.

---

[1] Fortner withdrew this claim in his opposition to the motion. (Plaintiff's Response, Docket #20, pg. 8)

3. Provenzano made both the decision to hire Fortner and the decision to terminate his employment which belies Fortner's allegations of racially discriminatory intent. <u>Proud v. Stone</u>, 945 F.2d 796, 797-98 (4th Cir. 1991)

## PLAINTIFF'S REPLY

Fortner opposed[2] the defendant's motion arguing that his co-worker, Gunter, spoke harshly to blacks, that Gunter should have

---

[2] Associated with this reply is an affidavit of the plaintiff which is self-serving, raises new claims which are not supported by the record, and contradicts his deposition. The Plaintiff's Affidavit even raises facts which are repudiated in the accompanying memorandum. (Cf. Plaintiff's Aff. ¶¶ 41 & 42 Docket #20-1 and Plaintiff's Memorandum pg. 8 Docket # 20). Another example, Plaintiff's Affidavit provides that he was fired by Freeland Construction, a subsequent employer, because of interference by the defendant. However the Plaintiff previously admitted in his deposition, and all other evidence indicates, that he was terminated because the construction job ended and that he has no evidence of involvement by the defendant in his discharge. (P. Dep. pp. 14, 119-121). Even though the issues raised in the affidavit are by in large included in the discussion of facts herein, the affidavit is insufficient to create an issue of fact for trial. "'[A] party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.' <u>Mack v. United States</u>, 814 F.2d 120, 124 (2d Cir. 1987); <u>Reid v. Sears, Roebuck and Co.</u>, 790 F.2d 453, 460 (6th Cir. 1986); <u>Franks v. Nimmo</u>, 796 F.2d 1230, 1237 (10th Cir. 1986); <u>Foster v. Arcata Associates, Inc.</u>, 772 F.2d 1453, 1462 (9th Cir. 1985), cert. denied, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); <u>Barwick v. Celotex Corp.</u>, 736 F.2d 946, 959-60 (4th Cir. 1984); <u>Camfield Tires, Inc. v. Michelin Tire Corp.</u>, 719 F.2d 1361, 1365-66 (8th Cir. 1983); but see <u>Kennett-Murray Corp. v. Bone</u>, 622 F.2d 887, 894 (5th Cir. 1980). This is so because, '[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.' <u>Perma Research & Development Co. v. Singer Co.</u>, 410 F.2d 572, 578 (2d Cir. 1969)." <u>Rohrbough by Rohrbough v. Wyeth Laboratories, Inc.</u>, 719 F.Supp. 470 (N.D. W. Va., 1989).

been fired too because he did not conduct a test while Fortner was on vacation, and RSFH prevented him from conducting the tests thus indicating its reason for firing him is pretextual.

## SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. Celotex Corp. v. Cattrett, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991); Anderson v.

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986). Unsupported speculation is not enough to withstand a motion for summary judgment. <u>Ash v. United Parcel Service, Inc.</u>, 800 F.2d 409, 411-12 (4th Cir. 1986). Indeed, the court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into "sheer speculation." The court may not move beyond inference and into the realm of mere conjecture. <u>Lovelace v. Sherwin-Williams Co.</u>, 681 F.2d 230, 242 (4th Cir. 1982).

## RACE DISCRIMINATION IN EMPLOYMENT LAW

Title VII provides that "[i]t shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ..." <u>Green v. Clarendon County School Dis. Three</u>, 923 F.Supp. 829, 840 (D.S.C. 1996)(citing Civil Rights Act of 1964, § 701 <u>et seq.</u>, as amended, 42 U.S.C. § 2000e-2(a) (1994)). Furthermore, "an unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

Title VII was fashioned "'to achieve equality of employment opportunities and remove barriers that have operated in the past

to favor an identified group of white employees over other employees....'" <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 417, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (quoting <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 429-30, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).

Under the disparate treatment scenario of employment discrimination, a plaintiff must demonstrate that the "employer ... treats some people less favorably than others because of their ... [race] ...." <u>International Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

In 1999, the Fourth Circuit reiterated that there are two avenues of proof by which an aggrieved employee can prove a disparate treatment Title VII violation. <u>Brinkley v. Harbour Recreation Club</u>, 180 F.3d 598 at 606-607 (4th Cir. 1999). First, an employee may utilize "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue." <u>Tuck v. Henkel Corp.</u>, 973 F.2d 371, 374 (4th Cir. 1992). To overcome a summary judgment motion based upon this method of proof, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." <u>Goldberg v. Green & Co.</u>, 836 F.2d 845, 848 (4th Cir. 1988). "What is required is evidence of conduct or

6

statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." <u>Fuller v. Phipps</u>, 67 F.3d 1137, 1142 (4th Cir. 1995).

When such direct evidence is lacking, the plaintiff may nevertheless proceed under the <u>McDonnell Douglas</u> burden shifting proof scheme. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); <u>see</u>, <u>Tuck</u>, 973 F.2d at 374. The <u>McDonnell Douglas</u> standard allocates the burden of proof. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981). Under this standard, the plaintiff bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination: that he belongs to a minority, that he was performing his work at a level which met his employer's reasonable expectations, and that he suffered an adverse employment action under circumstances which could indicate race was not treated neutrally.

Once the plaintiff meets the initial burden, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>Id.</u> This pretext analysis does not convert Title VII into a vehicle for challenging unfair-but nondiscriminatory-employment decisions. <u>See</u>, <u>Holder v. City of Raleigh</u>, 867 F.2d 823, 828 (4th Cir. 1989). Thereafter the complaining party must demonstrate that

race was a motivating factor for the employment practice.

Title VII also prohibits an employer from subjecting an employee to a hostile work environment because of race. In order to state a hostile work environment claim, a plaintiff must allege that the harassment was based on his race and that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." Chao v. Rivendell Woods, Inc., 415 F.3d 342, 347 (4th Cir. 2005). In other words, in order to demonstrate that he was subjected to a hostile work environment, Plaintiff must demonstrate that: "(1) he experienced unwelcome harassment; (2) the harassment was based on his race ...; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." White v. BFI Waste Servs., LLC, 375 F.3d 288, 297 (4th Cir. 2004); Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003).

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir. 2003) (en banc). First, the plaintiff must show that she "subjectively perceive[d] the environment to be abusive." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Next, the plaintiff must demonstrate that

the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81-82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

If there has been actionable harassment, an employer is not liable for Title VII harassment where: (a) "the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) ... the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

### **FACTS**

The facts, either undisputed or as presented by the plaintiff as the non-moving party on summary judgment, with all reasonable inferences drawn in favor of the plaintiff, to the extent supported by the record, are as follow.

Fortner was hired by David Provenzano, the white male Director of Engineering for RSFH on September 6, 2005, as a Trades Coordinator in Plant Operations. (P. Dep. pp. 42 - 43; P. Dep. Exhs. 1 and 9). Provenzano needed a Trades Coordinator to

attend to the maintenance of the physical plant side of operations in the Engineering Department. Fortner was hired by Provenzano specifically for his experience with generators, large equipment, and mechanical spaces. (P. Dep. pp. 20, 21, 35, and 36). Fortner had previously served under Provenzano at the Coast Guard Base in Charleston for over two years. Provenzano actively recruited Fortner to come to RSFH and work with Provenzano. (P. Dep. p. 20; Provenzano Dep. pp. 78-79). Provenzano offered Fortner the job over a month before Fortner could start and was glad to wait on him to be available. (Provenzano Dep. pp. 78-79).

RSFH had two Coordinators in the Engineering Department; Mike Gunter (Caucasian) and Fortner. (P. Dep. p. 35). Both had the job of maintaining the hospital building and the physical plant. Gunter's responsibility was primarily maintaining the hospital building. (P. Dep. p. 35). Fortner's area of responsibility was maintaining the physical plant. (P. Dep. p. 36). Gunter's hospital building maintenance side had a larger staff than Gunter's physical plant side, (P. Dep.; Provenzano Exh. 24), because the frequency and urgency of the work orders on the hospital side required more staff. However, Fortner had the ability to pull from the technicians assigned to Gunter, and he frequently did so. (P. Dep. p. 37; P. Dep. Exhs. 12-13, and 16). Gunter and Fortner were both required to work together to coordinate staff and job priority. (P. Dep. p. 37). Fortner and

10

Gunter worked together professionally at times, but Fortner did not get along with Gunter. (P. Dep. p. 37). Fortner believed, i.e. he "just had a feeling", their issues were both professional and racial. (P. Dep. p. 38). Fortner affied that Gunter was not civil to black employees[3] but was nice to whites.

In his four (4) page RSFH grievance[4] (P. Dep. Exh. 15), Fortner complains about Provenzano's behavior, however, Fortner stated in his deposition that Provenzano's behavior was unprofessional, but it was not because of Fortner's race. (P. Dep. pp. 104 - 105). Fortner never alleged any type of racial harassment or discrimination during his employment. No racial discrimination is alleged in his two (2) page rebuttal letter to the 2007 Mid-Year Performance Evaluation, and none is raised in the grievance filed in October 2007 at the time of his termination. (P. Dep. Exhs. 10 and 15).

RSFH had a detailed anti-discrimination policy and procedure in place at all times. Fortner did not remember seeing the policy and procedure but deposed that he knew one existed and where to locate them. (Pl. dep. pgs.28-30). Fortner did not report anything about Gunter to his supervisor or to any other

---

[3] The only other reference to any black/white dichotomy is in Fortner's affidavit that in meetings whites sat on one side of the room and blacks the other.

[4] His grievance was denied at the first of three steps and he did not pursue it farther.

11

manager at RSFH or to the anonymous, third party Compliance Line. (P. Dep. pp. 39 - 43 and 102 - 103).

One of Fortner's duties was to periodically perform generator testing to satisfy the regulations of a number of administrative agencies, JCAHO (Joint Commission), DHEC, and NFPA.[5] (P. Dep. pp. 36 - 37, 44 - 45, 52 - 54). Compliance with these standards was required so that RSFH could continue to operate under its DHEC license and could keep its Joint Commission accreditation. (P. Dep. pp. 53 - 54). DHEC, the NFPA, and the Joint Commission require this reliability testing to ensure that the hospital's generator is working properly. (P. Dep. pp. 53 - 67;). Fortner was responsible for making sure this test was performed and the requirements were satisfied. (P. Dep. pp. 59 and 69). The Joint Commission requires the hospital to run a test every 30 days (plus or minus 10 days), 12 times a year. The generator must run at a certain capacity or level, a dynamic load of at least 30% of the generator's nameplate rating, for at least 30 minutes to give accurate results. (P. Dep. p.

_____

[5] JCAHO is the acronym for The Joint Commission, which is an independent, non-profit organization that evaluates and accredits over 15,000 health care organizations nationwide. (P. Dep. pp. 52 -53). It is the standard by which hospital services, safety, and patient care are measured. JCAHO accreditation is what RSFH relies on to show that it meets Medicare and Medicaid certification requirements necessary for participation in those programs. (P. Dep. Pp. 44 - 45, and 66). DHEC is the South Carolina Department of Health and Environmental Control. NFPA is the National Fire Protection Association. (P. Dep. p. 62).

69). Additionally to meet DHEC regulations, the generator must come on within 10 seconds after interruption of the normal power. (P. Dep. 60). If the test does not meet these guidelines, the results are unreliable, Fortner is unable to determine whether the generator is running properly, and the test does not satisfy DHEC, NFPA, or the Joint Commission's requirements. (P. Dep. pp. 53-54).

For a little over a year, Fortner's Performance Reviews were satisfactory. (P. Dep. Exhs. 12 and 16). But, in June 2007, Fortner failed to both monitor the generator test and failed to realize[6] from the results that the runs were insufficient under DHEC's and the Joint Commission's rules. (P. Dep. pp. 74-81). Fortner did not review the tests or their results to determine if the generator was working properly. (P. Dep. pp. 65, 83-86).

When the June results were sent to Provenzano as a matter of course, he reviewed the tests for the past year and found that Fortner had failed to ensure the test was properly run 4 out of the 12 months from June 2006 to June 2007. (P. Dep. pp. 74 – 81). By the time Provenzano caught the discrepancies in mid-July, it

_____

[6]At oral arguments and in reply the plaintiff asserts that his job was to take the readings and report them to Provenzano. He intimates that whether the results were sufficient could only be determined after Provenzano entered the results in a computer. RSFH retorted that the computer entry was only a record keeping procedure and that anyone would know by looking at the readings whether the generator ran at a dynamic load of at least 30% of the generator's nameplate rating for at least 30 minutes.

was too late to re-run the tests properly within the time frame required by the Joint Commission and the NFPA. (P. Dep. pp. 62-64). The proper functioning of the generator could not be confirmed. (P. Dep. pp. 64-65; Provenzano Dep. pp. 58, 95).

On July 18, 2007, Fortner was disciplined for the June failure to properly supervise the required monthly generator test, and he was warned that failure to improve could result in termination. (P. Dep. pp. 74-88). He was also retrained on the test.

According to Fortner he was on vacation in July 2007 and Gunter was supposed to run the July test.[7] Nevertheless by October 2007, RSFH concluded that Fortner had still failed to ensure proper compliance or to even notice that his generator tests were inadequate. (P. Dep. pp. 90-92). Not only did Fortner fail to improve since his last counseling, i.e., since June 2007, (July, August, and September 2007), but Fortner also ignored testing that was too short and yielded too little capacity. (P. Dep. pp. 92-93 and 127). RSFH was again, or still, in danger that its Joint Commission accreditation could be affected. More importantly, RSFH had no assurance that its back up power was reliable. (P. Dep. p. 57). As a result of Fortner's continued disregard for one of the most vital parts of his job, he was

---

[7] Fortner complains that Gunter was not terminated for failing to conduct the July test.

terminated for unsatisfactory performance on October 4, 2007. (P. Dep. p. 103).

Following Fortner's termination, Gunter took Fortner's position as Trades Coordinator over the physical plant, a lateral move, (Provenzano Dep. pp. 44-45), and the relative physical plant maintenance and hospital maintenance staffing remained essentially the same as it had been when Fortner was over the physical plant and Gunter was over hospital maintenance. (P. Dep.; Provenzano Exh. 24).

Fortner never complained of insufficient staff until after he was cautioned for his performance in his 2007 Mid-year evaluation and reprimanded in June 2007 for poor performance. (P. Dep. Exhs. 10 and 13). He acknowledged concurrently, however, that "surge staff [was] always available as needed," and he was "repeatedly advised to work [with the] other supervisor for shared staffing." (P. Dep. Exh. 10). In addition, Fortner's workload was reduced in an effort to offset his performance and enable him to focus on the important priorities of his job. (P. Dep. Exh. 10). He maintains throughout all of his evaluations, and even in his post-termination grievance, that he was always able to handle his workload. (P. Dep. Exhs. 10-12, and 16).

Although Fortner complained post-termination that he was denied the necessary tools and equipment required to perform his

job, (Complaint at ¶ 32), the undisputed facts are that all tools at RSFH were available to all technicians. (P. Dep. p. 110-113). Fortner never complained to anyone at RSFH that he did not have the tools or equipment he needed to perform his job. (P. Dep. p. 102). However Fortner did complain, after being reprimanded, that he did not have enough cabinet shelves with which to organize the blueprint room. (P. Dep. Exh. 10; Provenzano Dep. pp. 86-88). Failure to procure these shelves neither contributed to the failure of any work order nor Fortner's ability to complete assigned tasks in a timely manner. (P. Dep. p. 90).

While budgets had to be respected, none of Fortner's projects were delayed or substandard due to lack of equipment. It was Fortner's responsibility to requisition what he needed, and he was, "quite vigilante [sic] in [his] duties to make this a safe working environment by purchasing the proper tools and safety equipment." (P. Dep. Exh. 16, 2005 Annual Performance Evaluation). In his 2006 Annual Performance Evaluation, Fortner again underscored how proactive he had been in purchasing tools and equipment and did not indicate any obstacles to doing so. (P. Dep. Exh. 12).

In January 2008, following his discharge by RSFH, Fortner became employed by Freeland Construction, a RSFH contractor. (P. Dep. pp 8-13; Provenzano Dep. Exh. 25). Fortner was subsequently discharged by Freeland Construction when the project he was

assigned to ended. (P. Dep. p. 14). Fortner states that Jack Portenier, a principal at Freeland, was concerned about getting "grief" from RSFH if Fortner was hired, but in reply to an email from Portenier, Provenzano replied that Fortner's employment, even on site at RSFH, was not a problem. (Provenzano Dep. pp. 99-101; Provenzano Dep. Exh. 25). Charles R. Maguire, a participant in the email correspondence and principal at Freeland, affirms that RSFH never put any pressure on Freeland to terminate Fortner and that Fortner's termination was due solely to a reduction in force for lack of work. He further affirms that the termination was on friendly terms and Fortner understood the reason he was being laid off. (Provenzano Dep. Exh. 25 and Aff. of Charles R. Maguire). Fortner admits there is no witness, conversation, or document that would support his allegation concerning interference by RSFH. (P. Dep. pp. 119-121).

By March 2008, following his employment with Freeland Construction, Fortner went to work for Johnny Suzuki. (P. Dep. pp. 9-10).

## DISCUSSION

Fortner's claim cannot survive summary judgment because of the absence of any material issues of genuine fact which require a trial and because the defendant has been shown to be entitled to judgment as a matter of law. Specifically, the plaintiff cannot show that he was meeting his employer's legitimate

expectations, cannot show that the defendant's legitimate reason for terminating his employment was pretextual, and cannot show that race was a motivating factor for the employment action.

There is no direct evidence or claim of direct evidence of race discrimination herein, so the analytical framework outlined above is applicable. It is conceded that the plaintiff is a member of a protected class and that he suffered an adverse employment action. However, the only evidence is that the plaintiff was responsible for testing the hospital's generator in such a manner as to comply with regulatory requirements, that he failed in that responsibility, was given a warning and additional training with regard to that duty, and still did not meet the regulatory and employer's expectations. While the plaintiff offers excuses as to why he could not meet the requirements, they are unsupported in the evidence. He was trained; he had all the tools and manpower necessary to run the tests, and did not run them properly. In some instances the failure was as simple as just not running the test for the required thirty minutes.

In the mid-year performance review for the first six months of 2007, the plaintiff was advised to "make significant improvements in his ability to organize and carry to completion multiple tasks. He also needs to continue his work to improve his interpersonal skills with staff." (Docket # 17-4 pg. 47). On

August 31, 2007, the plaintiff filed a rebuttal to the evaluation rebutting some of the noted shortcomings and committing himself to be successful and make positive changes. (Docket # 17-4 pp. 48-49). In neither the mid-year review nor the rebuttal was generator testing noted as a problem.

On July 18, 2007, Provenzano had an employee conference with Fortner concerning unsatisfactory generator testing for June 2007. Provenzano recommended, "Monitor and review testing more closely, ensure generator testing is completed within the required time period, at required load, and for the required duration. Failure to improve can result in disciplinary action upto and including suspension or termination." (Docket # 17-5 pg. 27)(sic). The plaintiff signed the record of this conference without adding any comments. Id.

On October 4, 2007, in a record of employee conference, Provenzano recommended discharge of the plaintiff because, "Frederick Fortner failed to properly supervise required monthly generator test runs resulting in an unsatisfactory generator test period for the months of July, August and September 2007. While generators were tested during these months, Frederick failed to notice the requirements of NFPA, DHEC and JCAHO for generator testing were not being met with regards to generator percent load and duration of run and take corrective action or provide corrective recommendations." (Docket # 17-5 pg. 29). The

19

plaintiff signed this record. He did not deny the unsatisfactory tests and only noted, "I do not agree with this recommendation." Id.

RSFH has been consistent throughout in expressing its legitimate non-discriminatory reason for discharging the plaintiff because of the generator testing issue, and the plaintiff has presented nothing to show that reasoning is pretextual.

Even if the plaintiff could show pretext, there is no evidence that race was a motivating factor for the employment action.

In his grievance of this discharge, Fortner complains of a hostile work environment and retaliation for having filed a "Rebuttal Letter" pertaining to his "Mid Evals." This grievance was denied. At no time throughout the employee conferences, the discharge process or the grievances did the plaintiff raise the specter of race discrimination. (Docket # 17-5 pp. 36-40). He never filed a complaint of race related issues in employment in accordance with the RSFH policies and procedures, and now before the court can only point to meetings in which the employees voluntarily sat on different sides of the room with members of their own race, and perceived unprofessional behavior which admittedly was not because of Fortner's race. (P. Dep. pp. 104-105). Interestingly in the plaintiff's opposition to summary

judgment (Docket # 20), the plaintiff presents no factual argument concerning racial animus.[8]  Instead the plaintiff argues, "essentially the Plaintiff was presented as the escape goat for the Defendant's own failure to provide the Plaintiff with access to the proper programs to perform the essential functions of his position, specifically to insure that the generator tests were run properly." (Docket # 20 p. 18)(sic). There is no claim by brief that race was the motivating factor in the plaintiff's discharge from RSFH.

The plaintiff's presentation is simply inadequate to withstand the defendant's properly supported motion for summary judgment.

## STATE CLAIM

This court may exercise supplemental jurisdiction over state law claims brought in conjunction with federal claims even though those state law claims could not have been brought by themselves. 28 U.S.C. § 1367.  However 28 U.S.C. § 1367(c) gives the courts substantial discretion to refuse to hear supplemental claims. One of the most common instances in which the court declines to hear supplemental claims is the instance in which the original

---

[8]  The plaintiff does quote case law in footnote 45, "Discriminatory intent my be inferred from the totality of the circumstances. . ."

federal claims have been dismissed. In such a case the supplemental claims are dismissed without prejudice.

In this case, the plaintiff has presented a state claim for interference by RSFH with Fortner's contractual relationship with Freeland Construction, one of his subsequent employers. However, as noted above, there is no factual basis for this claim and summary judgment should be granted with regard to this claim as well.

**CONCLUSION**

Accordingly, for the aforementioned reasons, it is recommended that the defendant's motion for summary judgment on the Title VII claims of race discrimination in employment and the state claim of interference with a contractual relationship be granted, and that this action be ended.

Respectfully Submitted,

*Robert S. Carr*

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina
December 17, 2010

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).